No. 25-6095

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

HAROLD WAYNE NICHOLS, Plaintiff-Appellant

v.

JONATHAN SKRMETTI, et al.,
Defendants-Appellees

*Appeal from the United States District Court for the
Middle District of Tennessee (No. 3:25-cv-00442)*

*Death Penalty Case
Execution Scheduled for December 11, 2025*

MOTION FOR PRELIMINARY INJUNCTION

FEDERAL DEFENDER
SERVICES OF EASTERN
TENNESSEE, INC.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Phone: 865-637-7979
Fax: 865-637-7999
Susanne_Bales@fd.org

Susanne Bales, TN BPR No. 017868
Luke P. Ihnen, TN BPR No. 035190
Stephen Ferrell, TN BPR No. 025170
Mary M. Kincaid, AZ Bar No. 030837
Emily Elison, OR Bar No. 103800

Plaintiff-Appellant Harold Wayne Nichols moves this Court for injunctive relief pursuant to Federal Rule of Appellate Procedure 8(a)(2) and the Eighth and Fourteenth Amendments to the United States Constitution. He moves this Court to apply the equal protection of the laws and direct the Defendants to enter into a similar agreement with him that it has extended to other death row inmates to not oppose a stay of execution while he challenges Tennessee's recently released method of execution protocol. Nichols also moves this Court to enter an injunction prohibiting the State of Tennessee from carrying out his execution under the current lethal injection protocol. Nichols offers the following Brief of Law in Support.

## I.    Procedural Background

On January 8, 2025, the Tennessee Department of Correction released a redacted version of its new method of execution protocol. On March 3, 2025, the Tennessee Supreme Court set a December 11, 2025 execution date for Nichols.

On April 18, 2025, Nichols filed a Complaint in the United States District Court for the Middle District of Tennessee, raising several constitutional challenges to the new protocol pursuant to 42 U.S.C § 1983. Complaint (R. 1; PageID# 1). Specifically, he alleged that the Defendants-Appellees

(hereafter "Defendants") denied him his rights to Due Process and Equal Protection under the Fourteenth Amendment to the United States Constitution by refusing to extend to him the same agreement it extended to other death row inmates: to not oppose a stay of execution while a method of execution claim was litigated. Complaint (R. 1; PageID# 29–32). He also raised facial and as-applied challenges to Tennessee's new protocol. Complaint (R. 1; PageID# 34–39). His Complaint sought the same injunctive relief he now seeks from this Court. Complaint (R. 1, PageID# 31 ("this Court should order the Defendants to enter into an agreement with Plaintiff 'not to oppose a motion for stay of execution ….'")); (R. 1, PageID# 57 ("issue a permanent injunction against the use of the revised lethal injection protocol")).

Almost two months later, Defendants moved to dismiss Nichols' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Mtn. Dismiss (R. 27; PageID# 296–98).

On November 6, 2025, Nichols filed a Motion for Preliminary Injunction. Mtn. PI (R. 47; PageID# 494–97).

On November 26, 2025, the District Court granted Defendants' Motion to Dismiss. Order (R. 56; PageID# 1608). The District Court did

not rule on the preliminary injunction motion.  On December 1, 2025, Nichols filed a notice of appeal. Notice (R. 58; PageID# 1611).

This Motion for Preliminary Injunction is filed consistent with Federal Rule  of Appellate Procedure 8(a)(2). Because the District Court failed to rule on Nichols' Motion for Preliminary Injunction, it failed to "afford the relief requested." Fed. R. App. P. 8(a)(2).

## II.    Factual Background

### A. Governor Lee Halts Executions because TDOC was not following its Method of Execution Protocol.

On the afternoon of April 21, 2022, less than one hour before the execution of Oscar Franklin Smith by lethal injection, Tennessee Governor Bill Lee issued a temporary reprieve due to "an oversight in preparation." Complaint Exh. 1 and 2 (Gov. Lee Statement on Temporary Reprieve, R. 1-1, 1-2; PageID# 60, 62).  It was later discovered that the drugs prepared for Oscar Smith's execution had not been tested for endotoxins, an oversight of the three-drug protocol's requirement to conduct testing of the lethal injection chemicals.  Reply Exh. 8 (R. 54-8; PageID#1386).

### B. The same sort of TDOC failures that led to the executive reprieve were also the subject of then-pending litigation.

At the same time, inmates King and Middlebrooks had pending

challenges to Tennessee's protocol in the United States District Court for the Middle District of Tennessee. *See King v. Strada, et.al.*, No. 3:18-cv-01234 (M.D. Tenn.); *Middlebrooks v. Strada, et al.*, No. 3:19-cv-01139 (M.D. Tenn.).

In *King*, documents turned over in discovery uncovered a persistent history of error and malfeasance on TDOC's behalf as it attempted to carry out its protocol including: attempting to acquire drugs from a veterinarian, exploring the use of Ketamine, discussing ways to compound to save money, failing to consult with a pharmacies about its protocol, regularly deviating from the protocol, failing to train personnel assigned to carry out lethal injection, preparing expired drugs for the executions of inmates Johnson and Irick, failing to follow written instructions related to managing the execution drugs, using a pharmacist who had been fined by a state board of pharmacy, failing to compound lethal injection drugs in accordance with controlling standards, failing to test for endotoxins and for potency, failing to follow compounding recipes, failing to properly store lethal injection chemicals, failing to conduct inventory of lethal injection chemicals and failing to dispose of expired

drugs.[1]

### C. The State of Tennessee agrees that King and Middlebrooks should not be executed until concerns about TDOC's ability to implement and follow a lethal injection protocol are resolved through an adversarial process.

After Governor Lee ordered the independent review, the State of Tennessee entered into an agreement with inmate King that it would not seek an execution date for him until judgment in his challenge to the lethal injection protocol had been resolved. The State of Tennessee also agreed that if Middlebrooks' execution date was reset, it would not oppose a stay. Complaint Exh. 3 (R. 1-3; PageID# 64–67). Pursuant to the Agreement, Middlebrooks received a stay of execution on April 1, 2025. *See* Complaint Exh. 4 (R. 1-4; PageID# 3, 30). As part of the Agreement, the State of Tennessee also agreed that the litigation in the King and Middlebrooks cases would be stayed until the independent review was completed.  Complaint Exh. 3 (R. 1-3; PageID# 64–67).

---

[1] This information is alleged in Nichols Complaint and is taken from the litigation in the *King* case. Complaint (R. 1; PageID# 8–11); *King v. Strata, et al*, No. 3:18-cv-01234 (M.D. Tenn., Doc. 180-3, PageID# 5585-5602; Doc. 200, PageID# 11774–11820).

**D. The Independent Review finds "TDOC operated in a task-oriented, tunnel-vision manner that failed to appreciate the interwoven nature of the lethal injection process as a whole."**

The Report and Findings of the Independent Review[2] acknowledged

errors unearthed in litigation and found others, including:

- The State of Tennessee never provided the pharmacy tasked with testing its lethal injection chemicals with a copy of the lethal injection protocol. Mtn. PI Exh. 8 (R. 54-8; PageID# 1383).

- No employee of the Tennessee Department of Correction informed the pharmacy tasked with testing the lethal injection chemicals that it should conduct an endotoxin test until the eve of Oscar Smith's scheduled execution. Mtn. PI Exh. 8 (R. 54-8; PageID# 1383).

- The pharmacy that tested Tennessee's lethal injection chemicals only tested the chemicals for potency and sterility, not endotoxins, because the pharmacy followed United States Pharmacopeia testing guidelines, not Tennessee's lethal injection protocol. Mtn. PI Exh. 8 (R. 54-8; PageID# 1383).

- The chemicals used in the execution of Billy Ray Irick in August 2018 were not tested for endotoxins, and the Midazolam used during Irick's execution was not tested for potency. Mtn. PI Exh. 8 (R. 54-8; PageID# 1383–84).

- The chemicals to be used in the event that Edmund Zagorski opted for lethal injection in November 2018 were

---

[2] Tenn. Lethal Injection Protocol Investigation Rep. and Findings, Butler Snow, LLP (Dec. 13, 2022). Mtn. PI Exh. 8 (R. 54-8; PageID# 1371–1548).

not tested for endotoxins and failed potency testing. Mtn.
PI Exh. 8 (R. 54-8; PageID# 1384).

- The chemicals used in the May 2019 execution of Donnie
  Edward Johnson were not tested for endotoxins. Mtn. PI
  Exh. 8 (R. 54-8; PageID# 1384).

- The chemicals to be used in the event that Stephen West
  opted for lethal injection in August 2019 were not tested
  for endotoxins. Mtn. PI Exh. 8 (R. 54-8; PageID# 1384).

The Independent Review concluded that there was an "absence of
adequate expertise, guidance, and counsel either enlisted by or provided
to TDOC in connection with Tennessee's lethal injection process." Reply
Exh. 8 (R. 54-8; PageID# 1420–21).

### E. TDOC's single drug revised protocol relies upon an execution method that inflicts significant pain and does not ameliorate the problems identified in the independent review.

The revised protocol calls for executing Nichols via 100 ml of a 50
mg/ml solution (a total of 5 grams) of pentobarbital. Mtn. PI Exh. 1 (R.
48-1, PageID# 524). Anesthesiology expert Gail Van Norman, M.D.,
opines that an IV injection of 5 gm of pentobarbital will render a prisoner
aware but unable to respond. Mtn. PI Exh. 1 (R. 48-1; PageID# 525). She
further opines it is very likely Nichols will experience flash (acute)
pulmonary edema and sensations of suffocation and drowning after
injection of 5 gm of Pentobarbital IV. Mtn. PI Exh. 1 (R. 48-1, PageID#

525). Flash pulmonary edema occurs when the lungs rapidly flood with fluid, causing shortness of breath, air hunger, and the sensation of drowning. Mtn. PI Exh. 1 (R. 48-1, PageID# 545). She opines that "[n]ot being able to breathe while drowning or asphyxiation is one of the most powerful, excruciating feelings known to man." Mtn. PI Exh. 1 (R. 48-1, PageID# 546).

Dr. Van Norman also notes that Tennessee's revised protocol does not provide information on how or where to place an IV if it is difficult to place an IV in the arm. She notes a cut down procedure without anesthesia can cause "excruciating pain." Mtn. PI Exh. 1 (R. 48-1, PageID# 551). She notes numerous executions have been delayed or halted because of difficulties with IV placement. Mtn. PI Exh. 1 (R. 48-1, PageID# 559).

Finally, Dr. Van Norman finds that the protocol does not provide critical information about storage of pentobarbital or its preparation for injection.  Mtn. PI Exh. 1 (R. 48-1, PageID# 553–54).  She notes the protocol provides for using an EKG but does not explain where to place the leads. Mtn. PI Exh. 1 (R. 48-1, PageID# 555).  She opines that the lack of guidance and standards increase risks of increasing and

prolonging suffering. Mtn. PI Exh. 1 (R. 48-1, PageID# 557).

### F. Byron Black suffered during his execution and still had a heartbeat when he was pronounced dead.

Media witnesses to Black's execution uniformly reported he was visibly in pain and moaned and gasped for several minutes. Mtn. PI Exh. 1 (R. 48-1, PageID# 541 (discussing witness accounts)).  Black's autopsy revealed pulmonary edema and congestion. Mtn. PI Exh. 1 (R. 48-1, PageID# 542).  It was later determined that he continued to have a heartbeat for at least two minutes after the physician declared him dead. Mtn. PI Exh. 1 (R. 48-1; PageID# 557). He probably had a heartbeat for longer than two minutes. While his heart continued to beat, the EKG printer was simply turned off. Mtn. PI Exh. 1 (R. 48-1, PageID# 557).[3] The physician who pronounced him dead apparently failed to recognize this fact. What is more, TDOC failed to follow its protocol's steps for what to do if the first dose of Pentobarbital does not kill the inmate.

---

[3] The media reported the EKG did not have tape in it during Smith's execution. Travis Loller, *Attorney says electrocardiogram at Tennessee execution was active after inmate pronounced dead,* Associated Press, Oct. 24, 2025.

## G. Execution by firing squad reduces the risk of severe pain and is readily implemented.

Medical doctor, former Police Medical Officer, and firearms expert, James S. Williams, M.D. offered an opinion that states the firing squad would cause a quick and painless death and is a readily implemented method of execution. Reply Exh. 7 (R. 54-7, PageID# 1350–69). Williams describes the Utah and U.S. Army firing squad execution procedures in detail. Reply Exh. 7 (R. 54-7, PageID# 1364–67). Williams is familiar with POST standards of training and certification in Tennessee, and a general-purpose rifle and caliber used by agencies in Tennessee would be suitable for execution by firing squad. Availability of a firearm is not subject to the same supply interruptions as lethal injection chemicals. Reply Exh. 7 (R. 54-7, PageID# 1366).

Dr. Williams opines that pain from a lethal firearm injury to the chest is relatively minor, if not painless, and of short duration. Targeting the heart and great vessels of the chest denies the nervous system the blood supply necessary to function. A firing squad execution stops the heart as well as the blood supply to the brain Dr. Williams opines the firing squad causes death with minimal pain and suffering. The firing squad would cause nearly instantaneous loss of purposeful movement

suggesting rapid loss of consciousness and the inability to perceive pain. Reply Exh. 7 (R. 54-7, PageID# 1354–58).

### H. Nichols is similarly situated to King and Middlebrooks.

Nichols is similarly situated to King and Middlebrooks. Middlebrooks was convicted in 1989, King in 1985, and Nichols in 1990. All three men are death row inmates in Tennessee. The Attorney General moved for execution dates for Middlebrooks and Nichols on September 20, 2019. Their dates were reset because of the Covid-19 pandemic. Both men received new dates after the pandemic: Nichols received a new date of June 9, 2022, and Middlebrooks received a new date of December 8, 2022. Both men received executive reprieves on May 3, 2022, following the paused execution of Oscar Smith. On March 3, 2025, both men received execution dates for 2025: Middlebrooks received an execution date of September 10, 2025, and Nichols received an execution date of December 11, 2025. Because the State had extended an agreement to Middlebrooks that he could litigate his method of execution challenge to completion, Middlebrooks' date came and went. Yet Nichols does not have the benefit of such an agreement and faces imminent execution.

## III. Argument

This Court has the discretion and power to grant an injunction pending this appeal. *Eastern Greyhound Lines v. Fusco*, 310 F.2d 632, 634 (6th Cir. 1962). In *Eastern Greyhound Lines*, this Court noted it possesses the authority to grant injunctive relief and such power is a "necessary incident to our power to issue writs" under 28 U.S.C. § 1651. 310 F.2d at 634. A party may seek injunctive relief from this Court, as long as it meets the requirement of Federal Rules of Appellate Procedure 8(a)(2). *A. Philip Randolph Institute v. Husted*, 907 F.3d 913, 917 (6th Cir. 2018). In Nichols' case, the District Court failed to rule on Nichols' motion for preliminary injunction and moving now in the District Court is "impracticable" due to time constraints. Because there is no District Court order denying a preliminary injunction, this Court reviews Nichols' motion *de novo. A. Philip Randolph Institute,* 907 F.3d at 917.

Whether Nichols seeks a stay or a preliminary injunction under Rule 8(a), the factors are the same.  These factors are the (1) likelihood the party seeking injunctive relief  will ultimately prevail on the merits, (2) whether he will face irreparable injury in the absence of an injunction; (3) whether the issuance of an injunction would not cause substantial

13

harm to others; and (4) and whether the public interest will be served by issuing the injunction. *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). These factors are interrelated considerations to be balanced. *Michigan Coalition of Radioactive Material Users*, *Inc.,* 945 F.2d at 153. The "strength of the likelihood of success on the merits that needs to be demonstrated is inversely proportional to the amount of irreparable harm that will be suffered if a stay does not issue." *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002).

### A. Nichols has a likelihood of success in establishing the State of Tennessee violated his Equal Protection Rights when it refused to extend him the same agreement to not oppose a stay of execution that it extended to other inmates.

The State of Tennessee violated Nichols' rights under the Equal Protection Clause when it refused to extend to him the same agreement not to oppose a stay of execution that it extended to other inmates. Complaint (R. 1, PageID# 29–33). A state violates the Equal Protection Clause when it makes distinctions that either "burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference."

*Radvansky v City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."). The Defendants' refusal to extend the same agreement that they extended to Middlebrooks and King to Nichols violates the Equal Protection Clause of the Fourteenth Amendment.

### i. Nichols is a "class-of-one" and has been denied the equal protection of the laws.

Nichols may advance a class-of-one theory because he has been "intentionally treated differently from others similarly situated" and because "there is no rational basis for the difference in treatment." *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citing *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441 (1923)). The "general principle" of the Equal Protection Clause is that "similarly situated persons should be treated alike." *Ondo v. City of Cleveland*, 795 F.3d 597, 607 (6th Cir. 2015) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439

(1985)). The Defendants have failed to articulate a rational basis for different treatment here.

Middlebrooks, King, and Nichols were all convicted before 1999: Middlebrooks in 1989; King in 1985; and Nichols in 1990. They are similarly situated in that they are all death-sentenced prisoners in the custody of TDOC in Nashville, Tennessee with pending challenges to Tennessee's revised lethal injection protocol. Middlebrooks and Nichols are similarly situated in that they have had similar settings of dates followed by reprieves.

Nichols has "relevant similarity" to other similarly situated prisoners. *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). Stated simply, the Defendants cannot treat "some groups of citizens differently than others." *McGowan v. Maryland*, 366 U.S. 420, 425 (1961). The Defendants here have broken that basic promise. They have denied Nichols the equal protection of the laws as a class-of-one, and there is no rational basis for Defendants' different treatment of these inmates.

**B. Nichols has a strong likelihood of prevailing on his facial and his as applied challenges to TDOC's lethal injection protocol.**

The elements of an Eighth Amendment method of execution

challenge are that the State's method of execution is sure or very likely to cause a substantial risk of severe pain—"severe pain over and above death itself"; and (2) that there is a feasible, readily implemented alternative that substantially reduces the risk of harm that the State unreasonably refuses to adopt. *See Nance v. Ward*, 597 U.S. 159, 164 (2022). When considering the proof of a feasible alternative, the Supreme Court has held it is important not to "overstate" the alternative method element and that it may be established by pointing to other states that rely on the alternative method. *Bucklew v. Precythe*, 587 U.S. 119, 139–40 (2019). In *Bucklew,* the Supreme Court held this standard applies to both facial and as applied challenges. 587 U.S. at 135–36.

Nichols offers evidence that injection of a lethal dose of pentobarbital is sure or very likely to cause acute (flash) pulmonary edema. He is likely to remain aware, but unable to respond, as he suffocates. His awareness will not be obvious to observers because he will be restrained or taped down. Byron Black's autopsy showed that he developed pulmonary edema. Media witnesses reported he moaned and audibly gasped for minutes during his execution. He was still alive for minutes after he was pronounced dead. He suffered a tortuous and

lingering death. He certainly suffered more severe pain than was necessary to cause his death

The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits punishments that are "unduly harsh in light of longstanding prior practice." John F. Stinneford, *The Original Meaning of "Cruel,"* 105 Geo. L. J. 441, 493 (2017). Based on publicly available evidence with no discovery, execution with pentobarbital presents a substantial risk of serious harm of the type condemned by the Eight Amendment. Additionally, the vagueness and compartmentalization of Tennessee's protocol means officials do not appreciate something might go wrong.

There is also a genuine risk the protocol will be wrongly implemented, as applied to him. It is likely mistakes will occur when the protocol is applied to him. Serious mistakes have already occurred. The EKG machine did not have tape in it during Oscar Smith's execution. The State of Tennessee has posited that the protocol does not say the EKG machine must have tape in it. In Black's execution, the doctor erroneously pronounced him dead and did not even bother to look at the EKG. His heart was still beating when TDOC personnel unplugged the EKG. They never even realized he was still alive and they never

administered the second dose of pentobarbital, as the protocol requires.

The risk is even more substantial when compared to the minimal risk of serious pain and suffering during a firing squad execution. Dr. Williams, who has a background in emergency medicine and firearms, is uniquely qualified to discuss firing squad executions. He explains that death by firing squad is quick and painless. In his report, he explains how to carry out an execution by firing squad and even notes the supply of appropriate firearms is more reliable than for lethal injection chemicals. He notes there is already a firing squad at the prison where Tennessee's death row inmates are house. He notes other states have been able to accomplish execution by firing squad. The risk of serious pain—severe pain beyond that necessary to cause death—is minimal with a firing squad execution. When execution by firing squad, which is quick and painless, is compared to execution by lethal injection, which causes pulmonary edema and where the inmate lingers, the State of Tennessee is without penological justification for failing to implement the firing squad.

### C. Nichols will suffer irreparable injury should a stay of execution not issue.

Nichols faces execution by lethal injection of pentobarbital on

December 11, 2025. Nichols will suffer irreparable harm if a preliminary injunction is not granted. *See In re: Ohio Execution Protocol Litig. (Lorraine)*, 671 F.3d 601, 602 (6th Cir. 2012). "To be sure, when it comes to irreparable injury, death penalty cases are often different." *White v Plappert*, 137 F.4 579, 581 (6th Cir. 2025) (quoting *Wainwright v. Booker*, 473 U.S. 935, 935 n. 1 (1985) (Powell, J., concurring)).

There is no doubt that failure to grant a preliminary injunction enjoining Defendants from executing him under the revised protocol would cause Nichols harm. He may be subject to severe pain and suffering—severe pain beyond that necessary to cause his death—if he suffers pulmonary (flash) edema during an unconstitutional execution. If he is executed while his constitutional challenge to his execution by pentobarbital is still pending, he will also lose the opportunity to vindicate an important Eighth Amendment right.

There is nothing more final and irreversible than death. For Defendants to unconstitutionally execute Nichols before he has a chance to be heard on the merits of his claims would be irreparable harm for which he has no adequate remedy. This factor weighs in

Nichols' favor.

### D. Defendants will not be harmed if a stay of execution issues, and the public interest will be served by issuing an injunction.

Defendants cannot dispute this factor when they have agreed to not oppose a stay for Middlebrooks nor to seek an execution date for King while their challenge to the protocol winds its way through the courts. A preliminary injunction enjoining the state from carrying out his execution by lethal injection of pentobarbital will not injure the State of Tennessee. While Tennessee has an interest in seeing finality by imposing a constitutional punishment, substantial harm to the State will not follow from carrying out an unconstitutional method of execution.  Although the "powerful and legitimate interest in punishing the guilty" attaches to both "the State and the victims of crime alike." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (citations and internal quotations omitted), the State and its citizens have an interest in the punishment being doled out in accordance with constitutional standards. "No substantial harm can be shown in the enjoinment of an unconstitutional policy." *Chabad of S. Ohio v. City of Cincinnati*, 233 F. Supp. 2d 975, 987 (S.D. Ohio 2002), aff'd sub nom. *Chabad of S. Ohio &*

*Congregation Lubavitch v. City of Cincinnat*i, 363 F.3d 427 (6th Cir. 2004); *accord Workman v. Bredesen*, No. 3:07-0490, 2007 WL 9783293, at *2 (M.D. Tenn. May 4, 2007) ("The relative harm to Defendants of postponing the execution until a full review of the new execution protocol can be completed does not outweigh Plaintiff's interest. Defendants have no interest in proceeding with an execution protocol which may ultimately be found unconstitutional.")  The public interest would be served by issuing injunctive relief.

The "public interest is served only by enforcing constitutional rights and by the prompt and accurate resolution of disputes concerning those constitutional rights." *In re: Ohio Execution Protocol Litig. (Lorraine)*, 840 F. Supp. 2d at 1059; *see also Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012); *Miller*, 622 F.3d at 540 ("When a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." (internal quotation marks and citation omitted)).  "[T]here is the highest public interest in the due observance of all constitutional guarantees …." *United States v. Raines,* 362 U.S. 17, 27 (1960).  The

public interest is served by protecting constitutional rights. *Chabad of S. Ohio and Congregation Lubavitch v. City of Cincinnati,* 363 F.3d 427 (6th Cir. 2004).

Accordingly, this factor also weighs in Nichols' favor.

## CONCLUSION

Nichols has a strong likelihood of prevailing on the merits of his claims. The threat of irreparable harm by being subject to an unconstitutional execution method is genuine. An injunction will not harm the State.    The public interest favors preventing an unconstitutional execution.

For the reasons set forth herein, this Court should:

1) Grant injunctive relief by directing the State of Tennessee to extend to Nichols the same agreement it extended to Middlebrooks and King;

2) Enjoin the State of Tennessee from executing Nichols under its current protocol;

3) Remand this matter to the district court with directions that it order Defendants-Appellees to answer Nichols's complaint, that it order discovery in this matter, that it set this matter for evidentiary hearing; and

4) Grant such other and further relief as the Court deems just and necessary in the premises.

Filed this 3rd day of December, 2025.

FEDERAL DEFENDER SERVICES OF
EASTERN TENNESSEE, INC.

By:    */s/ Susanne Bales*
Susanne Bales, TN BPR No. 017868
800 South Gay Street, Suite 2400
Knoxville, TN 37929
Phone: 865-637-7979
Fax: 865-637-7999
Susanne_Bales@fd.org

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit set forth in the Federal Rules of Appellate Procedure and the Sixth Circuit Rules because this document contains 4,806 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Susanne Bales*
Susanne Bales, TN BPR No.  017868
FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.
800 S. Gay Street, Suite 2400
Knoxville, TN  37929
Phone: 865-637-7979
Fax: 865-637-7999
Susanne_Bales@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2025, a true and correct copy of the foregoing document was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

<u>/s/ *Patricia McIntosh*</u>
Patricia McIntosh, Paralegal
Capital Habeas Unit